United States District Court
District of Connecticut
FILED AT NEW HAVEN

June 7, 2024
By: S. Santos
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELLULAR DEVICE ASSIGNED CALL NUMBER 475-238-4911 STORED AT A PREMISES CONTROLLED BY VERIZON WIRELESS | Case No. 3:24MJ 00511 (MEG)<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT
AND ORDER PURSUANT TO 18 U.S.C §§ 3122 AND 3123**

I, Ryan Halpin, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned phone number 475-238-4911 (the "**TARGET TELEPHONE**"), with no listed subscriber that is in the custody or control of Verizon, a wireless communications service provider that is headquartered in Bedminster, New Jersey. As a provider of wireless communications service, Verizon is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require Verizon to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested

1

warrant is designed to also comply with the Pen Register Act. See 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. See 18 U.S.C. § 3123(b)(1).

4. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed as such since August 2019. I attended the Basic Field Training Course at the FBI Academy in Quantico, Virginia. I am currently assigned to the New Haven Division of the FBI, where I have been tasked with investigating violent criminal street gangs and organized criminal enterprises involving the smuggling, distribution, and sale of illegal drugs. Prior to becoming an FBI Special Agent, I was a police officer for seven years. As a police officer, I investigated numerous crimes, including drug dealing/distribution and firearms-related offenses. In connection with these investigations, I have coordinated controlled purchases of illegal drugs utilizing cooperating sources; conducted electronic and physical surveillance of individuals involved in organized criminal activity; analyzed records documenting the purchase and sale of illegal drugs and other items; and debriefed cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by organized criminal enterprises.

5. Based on my training and experience, I know that narcotics traffickers often use cellular telephones and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. I know that drug traffickers frequently have access to multiple cellular telephones or that they use other means of communication from their primary devices such as Facebook, Facetime, Snapchat, WhatsApp and other messaging applications, that they know it makes it more difficult for law enforcement to intercept those

communications. I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons and prepaid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate, and utilize, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement.

6. The facts in this affidavit come from my own personal knowledge from participating in this investigation and my training and experience, and from information obtained by me from other law enforcement personnel. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge about this matter. It sets forth only those facts necessary to support the requested authorization.

7. Based upon information I know as a result of my participation in this investigation, as well as information which I have determined to be accurate and reliable, provided to me by other sources, I am familiar with the information discussed herein. Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated.

8. The statements contained in this affidavit are based, in part, on information obtained through: (a) physical surveillance; (b) other law enforcement officers and their reports; (c) Confidential Source information; (d) my experience and training. The facts in this affidavit come from information learned from special agents and task force officers of the FBI, law enforcement personnel, and information received from a cooperating witness and a source of information. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth everything I know regarding this investigation.

9. Probable cause exists to believe that the receipt of the requested information will constitute or lead to evidence of violations of 21 U.S.C. § 841(a)(1) (distribution of narcotics and possession with intent to distribute narcotics), 21 U.S.C. § 843(b) (use of a telephone to facilitate a narcotics felony), and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute narcotics (collectively, the "TARGET OFFENSES"), as well as the identification of people who are engaged in the commission of these offenses. For the reasons set out in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by Jermaine MONTEETH, also known as "Maine," who is utilizing the **TARGET TELEPHONE**, and others who have yet to be identified. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of the TARGET OFFENSES and will lead to the identification of individuals who are engaged in the commission of these offenses.

10. Since this Affidavit is being submitted for the limited purpose of authorizing the government to obtain location information described in Attachment B, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for the proposed warrants.

11. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

12. The FBI New Haven Safe Streets and Gangs Task Force ("NHSSGTF") has been investigating a drug trafficking organization in which MONTEETH is a member. Based on the

investigation to date, the details of which are set forth below, I believe that MONTEETH is distributing cocaine, heroin, and fentanyl with several other individuals whose identities are known to investigators. MONTEETH utilizes a "work" cellphone, the **TARGET TELEPHONE**, for street-level drug sales.

**Controlled Buy During the Week Ending on April 27, 2024**

13. During the week ending April 27, 2024 at the direction of, and under the supervision of investigators, CS-2 purchased four (4) Ziploc bags containing approximately 3 grams of a substance that field tested positive for fentanyl and one (1) Ziploc bag containing approximately 2 grams of a substance that field tested positive for cocaine from MONTEETH.

14. Prior to the controlled buy, CS-2 met with investigators at a pre-arranged location and investigators observed CS-2 call an associate of MONTEETH, who directed CS-2 to meet at a public parking lot in New Haven, Connecticut and enter a white vehicle operated by MONTEETH.

15. Investigators observed CS-2 arrive and park at the agreed-upon meeting location and shortly after a white Kia Sportage bearing Connecticut registration BH52498 (herein referred to as "Target Vehicle-1"), driving away from CS-2's vehicle. The Kia Sportage was registered to Veronica Monteeth (DYOB 01/20/1969) of 38 Midhill Drive, Hamden, Connecticut. (Veronica Monteeth per a New Haven Police Department report on April 30, 2024 is MONTEETH's mother.)

16. After the transaction, CS-2 was met by investigators at a predetermined location and debriefed. CS-2 stated MONTEETH's associate instructed him over the phone to enter a white vehicle that was going to park next to his. CS-2 entered the white car and described the male as a light skinned black male with tattoos on his neck was the sole occupant during the transaction. Investigators later identified the male CS-2 met with as Jermaine MONTEETH. CS-2 provided

5

investigators with the purchased narcotic which field tested positive for the presence of cocaine and had a gross weight of 2 grams and fentanyl and had a gross weight of 3 grams. Confirmatory lab analysis is pending. Investigators have reviewed the audio and video recording of the meeting between CS-2 and MONTEETH, and it is consistent with CS-2's report.

**Controlled Buy During the Week Ending in May 11, 2024**

17. During the week ending May 11, 2024, at the direction of, and under the supervision of investigators, CS-2 purchased four (4) Ziploc bags containing approximately 2.5 grams of a substance that field tested positive for fentanyl and 1.5 grams of a substance that field tested positive for cocaine from MONTEETH.

18. CS-2 met with investigators at a pre-arranged location and investigators observed CS-2 call the **TARGET TELEPHONE**. Investigators recognized the male who answered the phone on speakerphone as MONTEETH. CS-2 made arrangements to purchase fentanyl from MONTEETH. MONTEETH directed CS-2 to meet at a public area in New Haven, Connecticut.

19. In sum and substance, during the first phone conversation, CS-2 calls MONTEETH via the **TARGET TELEPHONE** and discussed a meeting location in New Haven to conduct a drug deal.

20. Surveillance units observed Target Vehicle-1 arriving to the area where MONTEETH informed CS-2 to meet. Investigators observed Target Vehicle-1 park and CS-2 entered Target Vehicle-1. CS-2 exited the Target Vheicle-1 a short time later. Target Vehicle-1 left the area.

21. After the transaction, CS-2 was met by investigators at a predetermined location and debriefed. CS-2 stated MONTEETH was the sole occupant of the vehicle he was operating. CS-2 provided investigators with the purchased narcotic which field tested positive for the presence of fentanyl with a gross weight of 2.5 grams and cocaine with a gross weight of 1.5 grams. Confirmatory lab analysis is pending.

Investigators have reviewed the audio and video recording of the meeting between CS-2 and MONTEETH, and it is consistent with CS-2's report. While reviewing the audio and video recording, investigators also determined that MONTEETH was the sole occupant of Target Vehicle-1.

**Controlled Buy During the Week Ending in May 18, 2024**

22. During the week ending May 18, 2024, at the direction of, and under the supervision of investigators, CS-2 one (1) Ziploc bag containing 1.0 gram of a substance that field tested positive for fentanyl from MONTEETH.

23. CS-2 met with investigators at a pre-arranged location and investigators observed CS-2 call the **TARGET TELEPHONE**. Investigators recognized the male who answered the phone on speakerphone as MONTEETH. CS-2 made arrangements to purchase fentanyl from MONTEETH. MONTEETH directed CS-2 to meet at a public area in New Haven, Connecticut.

24. In sum and substance, CS-2 spoke with MONTEETH via the **TARGET TELEPHONE** and discussed meeting in Branford, Connecticut, to conduct a drug deal.

25. Surveillance units observed Target Vehicle-1 already parked in the area that MONTEETH informed CS-2 to meet.

26. After the transaction, CS-2 was met by investigators at a predetermined location and debriefed. CS-2 stated MONTEETH was the sole occupant of the vehicle he was operating. CS-2 provided investigators with the purchased narcotic which field tested positive for the presence of fentanyl and had a gross weight of 1.0 gram. Confirmatory lab analysis is pending. Investigators have reviewed the audio and video recording of the meeting between CS-2 and MONTEETH, and it is consistent with CS-2's report. While reviewing the audio and video

recording, investigators also determined that MONTEETH was the sole occupant of Target Vehicle-1.

## Background Regarding Telephones and Location Information

27. Obtaining precise location information for the **TARGET TELEPHONE** will assist investigators in identifying where MONTEETH is meeting co-conspirators, where he may have other stash houses and where he may be going to resupply. Investigators have been able to do a significant amount with source reporting, other agency reporting, toll analysis, social media analysis, and physical surveillances; however, investigators are missing an extensive amount of MONTEETH's activities. Investigators know MONTEETH to travel around with a "binder," full of different drug substances, to include fentanyl, based on source reporting and audio and video recording used during the controlled purchases.

28. Based upon my training and experience, I know that persons who traffic in illegal narcotics often facilitate their criminal activity by use of wireless telephones. Drug traffickers routinely keep their wireless phones on their person so they can stay in frequent communication with their associates, especially when a drug transaction has been planned, is being planned, or is imminent. I have made arrests of drug traffickers and it is very common that wireless telephones are seized from the trafficker's person. Having the cell phone on their person allows the meet location to be changed very quickly or set at the last moment, which is often a counter-surveillance ploy. In addition, having the cell phone(s) on their person allows them to conduct business more efficiently and while on the move even when they visit stash locations or sources of supply.

29. In my training and experience, I have learned that Verizon is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate

information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

30. Based on my training and experience, I know that Verizon can collect cell-site data on a prospective basis about the **TARGET TELEPHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

31. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

32. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

33. Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET TELEPHONE**'S user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

34. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the **TARGET TELEPHONE**, without geographic limit, for a period of forty-five days (45) days pursuant to 18 U.S.C. § 3123(c)(1).

35. I further request that the Court direct Verizon to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

36. I also request that the Court direct Verizon to furnish the Government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with their services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the Government. The Government shall reasonably compensate the Providers for reasonable expenses incurred in furnishing such facilities or assistance.

37. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until at least 30 days after the collection authorized by the warrant has been completed. There is

reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **the TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

38. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

The foregoing is true and accurate to the best of my knowledge.

Respectfully Submitted,

RYAN HALPIN
Digitally signed by RYAN HALPIN
Date: 2024.06.07 11:23:30 -04'00'

_____
Ryan Halpin
Special Agent
Federal Bureau of Investigation

The truth of the foregoing affidavit has been attested to me by FBI Special Agent Ryan Halpin on this __7th__ day of June 2024.

Maria E. Garcia
Digitally signed by Maria E. Garcia
Date: 2024.06.07 17:34:45 -04'00'
_____
HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

Records and information associated with the cellular telephone assigned call number 475-238-4911 (hereafter "**the TARGET TELEPHONE**"), with an unknown subscriber, that is in the custody or control of Verizon (the "Service Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, New Jersey.

## ATTACHMENT B

### Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following information about the customers or subscribers associated with the Target Telephone for the last 30 days:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records;

    ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Telephone, including:

    (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    (ii) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Telephone for a period of 45 days from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Telephone** will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

c. Information about the location of the **TARGET TELEPHONE** for the period of 30 days from the date of the warrant, during all times of day and night. "Information about the location of the **TARGET TELEPHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the Government. In addition, the Service Provider must furnish the Government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **the TARGET TELEPHONE** on the Service Provider's

2

      network or with such other reference points as may be reasonably available, and at such intervals and times directed by the Government. The Government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

  ii. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

  iii. This warrant does not authorize the seizure of the contents of any communications.

**II.**     **Information to be Seized by the Government**

All information described above in Section I that constitutes [evidence, fruits, contraband, and instrumentalities] of violations of 21 U.S.C. § 841(a)(1) (distribution of narcotics and possession with intent to distribute narcotics), 21 U.S.C. § 843(b) (use of a telephone to facilitate a narcotics felony), and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute narcotics) involving the individuals named in the affidavit and others yet to be identified during the thirty day period from the date of the warrant.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC
RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Verizon, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon, and they were made by Verizon as a regular practice; and

b. such records were generated by Verizon's electronic process or system that produces an accurate result, to wit:

   1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon in a manner to ensure that they are true duplicates of the original records; and

   2. the process or system is regularly verified by Verizon, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                              Signature